**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

LINDA HOLT,

Plaintiff,

v.

EXPERIAN INFORMATION SOLUTIONS, INC., and EQUIFAX INFORMATION SERVICES, LLC,

Defendants.

**Case No.: 2:26-cv-12356**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1. **FCRA, 15 U.S.C. § 1681, *et seq.***

Plaintiff Linda Holt ("Plaintiff"), through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.,* against Experian Information Solutions, Inc. ("Experian") and Equifax Information Services, LLC ("Equifax") (all defendants collectively, "Defendants").

## I. INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is

intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. Unfortunately, however, this information has also became readily available for, and susceptible to, mishandling and misuse. Individual consumers can, and do, sustain substantial damage, both economically and emotionally, when inaccurate or fraudulent information is disseminated and/or published about them. In fact, Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similarly interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, refinancing, a car or mortgage loan or other forms of credit.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the

personal, private, and financial information that they compile and sell about individual consumers.

6. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a **stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home**. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.,* 689 F.2d 72, 79 (6th Cir. 1982) [*quoting* 116 cong. Rec. 36570 (1970)] (*emphasis added*).

8. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy. *See* 15 U.S.C. 1681(a)(4).

9. Plaintiff's Complaint arises out of Defendants' blatantly inaccurate credit reporting, wherein Defendants reported to Plaintiff's potential creditors that a certain account of Plaintiff's was discharged in bankruptcy, when the account had not been discharged, and Plaintiff had in fact continued to make timely payments on the account and the account was in good standing.

10. Accordingly, Plaintiff brings claims against Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

11. Plaintiff's Complaint also alleges that Defendants also violated 15 U.S.C. § 1681 *et seq.* by failing to reasonably investigate Plaintiff's consumer disputes, which each resulted in Defendants' reporting inaccurate information about Plaintiff.

12. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.,* as described herein.

## II. JURISDICTION AND VENUE

13. The District Court has federal question jurisdiction over these claims pursuant to 28 U.S.C. § 1331; 15 U.S.C. § 1681.

14. Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this district. Defendants transact business here; as such, personal jurisdiction is established.

## III. PARTIES

15. Plaintiff is a natural person residing in Canton, Michigan.

16. Plaintiff is a *consumer* as defined by the FCRA, 15 U.S.C. § 1681a(c).

17. Defendant Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Experian's principal place of business is located at 475 Anton Boulevard, Costa Mesa, California 92626. Experian can be served through its registered agent, C T Corporation System, located at 330 North Brand Boulevard, Glendale, California 91203.

18. Defendant Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street NW, Atlanta, GA 30309. Equifax can be served through its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

19. Defendants regularly engage in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Defendants regularly furnish consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and are therefore "consumer reporting agencies" as defined by 15 U.S.C. § 1681a(f) of the FCRA.

20. During all times pertinent to this Complaint, Defendants were authorized to conduct business in the State of Michigan and conducted business in the State of Michigan on a routine and systematic basis.

21. During all times pertinent to this Complaint, Defendants acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

22. Any violations by Defendants were not in good faith, were knowing, negligent, willful, and/or intentional.

23. Defendants did not maintain procedures reasonably adapted to avoid any such violations.

## IV. FACTUAL BACKGROUND

### Summary of the Fair Credit Reporting Act

26. The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

27. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. §1681(a).

28. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which

is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

29. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. §1681i).

30. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with either or both of their statutory obligations under the FCRA.

**<u>The Defendants' Processing of Credit Information</u>**

31. Defendants, comprising the three major CRAs in the United States, regularly publish and distribute credit information about Plaintiff and other consumers through the sale of consumer reports.

32. Defendants' consumer reports generally contain the following information: (i) <u>Header/Identifying Information:</u> this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) <u>Tradeline Information</u>: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment

history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

33. Defendants obtain consumer information from various sources, including furnishers that provide consumer information to the CRAs, and information the CRAs independently source themselves or through third party providers, vendors or repositories, including computerized reporting services like PACER or Lexis-Nexis.

34. Defendants regularly seek out and procure consumer bankruptcy filing and discharge information on a daily basis, with the intention of including it in the consumer reports they sell to third parties for a profit.

35. The diligence Defendants exercise in uncovering and recording consumer bankruptcy filings is not replicated in Defendants' subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

36. Defendants' unreasonable policies, procedures, and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681(e)(b).

37. Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in its own files.

38. The majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like Defendants) to make lending decisions. Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models) to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the Defendant's reports.

39. The information Defendants include in consumer reports contributes to a consumer's overall creditworthiness and determines his or her FICO Score.

40. FICO and other third-party algorithms use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

41. The information reported by Defendants contributes to consumer creditworthiness, including their FICO Scores, which are calculated using information contained in the Defendant's consumer reports.

42. FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

a. "Payment history" refers to whether a consumer has paid his or his bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the greater the harm to the FICO Score.

b. The "amount of debt" a consumer owes has a major impact on his or her credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

43. Lenders also consider a consumer's debt-to-income ratio ("DTI") based on the total amount of debt reported by Defendants in their consumer reports. DTI compares the total amount a consumer owes to the total amount a consumer earns.

44. A consumer's income, however, is not included in his or her consumer report; only his or her amount of debt is.

45. Lenders consider a consumer's DTI when deciding whether to approve financing and the credit terms thereof.

46. The higher the amount of reported debt that a consumer has, or appears

to have, the worse the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms (e.g., higher interest, lower credit limits).

47. A consumer who has obtained a bankruptcy discharge and has a consumer report that is inaccurately reporting outstanding or past due balances after the bankruptcy discharge suffers greater harm than if that account was accurately reporting as having a zero-dollar balance.

48. Defendants are well aware that the effect of a Discharge Order in a Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding.

49. Additionally, in or around 2009, Defendants implemented their own automated software "bankruptcy scrub" following the settlement agreement in *White v. Experian Info. Sols.*, No. SACV 05-1070 DOC (MLGx), (C.D. Cal. 2008).

50. The *White* settlement makes clear that the CRAs know or should know that pre-petition, unsecured consumer debts are typically discharged in Chapter 7 proceedings. *Benjamin v. Experian Info. Solutions*, 561 F. Supp. 3d 1330, 1340 (citing *Morris v. Experian Info. Sols.*, 478 F. Supp. 3d at 769).

51. Defendants' bankruptcy scrub software identifies pre-petition accounts and makes assumptions about which accounts were discharged through the

Chapter 7 bankruptcy, even when the furnisher does not update the accounts as discharged.

52. In other words, Defendants' automated bankruptcy scrubs assume Defendants' notice of a Chapter 7 discharge is in fact notice that a consumer's pre-petition accounts may be reporting inaccurately, and Defendants will overwrite data reported by a furnisher according to its assumptions and algorithms.

53. However, Defendants have intentionally chosen to disregard knowingly inaccurate open balance and payment obligations of certain types of pre-bankruptcy accounts in the Defendants' software programming of their automated "bankruptcy scrub" that they have been employing for well over a decade.

54. Defendants are also aware of the effect of a reaffirmation agreement, which allows a consumer to remain liable for the debt and excludes the debt from the bankruptcy discharge.

55. Information regarding whether a debt has been reaffirmed or successfully challenged through an adversary proceeding is retrievable from the same sources Defendant obtains the bankruptcy case information.

56. Additionally, Defendants receive actual notice of reaffirmation agreements from furnishers of account/tradeline information.

57. However, Defendants regularly report inaccurate information about consumers who have received a Discharge Order.

58. Although Defendants were notified of their inaccurate reporting and had the information necessary to correctly report Plaintiff's account, Defendants failed to verify the information.

59. Instead, Defendants followed unreasonable procedures that allowed them to blindly rely on the furnishers' deficient investigation and report their results, despite possessing conflicting information about Plaintiff's accounts.

60. Rather than following reasonable procedures to assure maximum possible accuracy, Defendants inaccurately report information regarding pre-bankruptcy debts even if that information ignores or contradicts information known and reported by the CRAs themselves.

61. Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints against the Defendants for their inaccurate reporting following a consumer bankruptcy.

62. Therefore, Defendants are on continued notice of their inadequate post-bankruptcy reporting procedures, including those that result in inaccurate account and payment statuses, both before and after receiving a dispute from the consumer.

*Allegations Specific to the Credit Reporting of Plaintiff*

63. Plaintiff filed for a "no-asset" Chapter 7 Bankruptcy on or about August 26, 2025 in the United States Bankruptcy Court for the Eastern District of Michigan, petition no. 25-48593-tjt.

64. Plaintiff received an Order of Discharge on or about February 10, 2026.

65. Thereafter, Plaintiff was not personally responsible for her dischargeable debts and those debts have a $0 balance after the bankruptcy discharge.

66. Defendants prepared one or more consumer reports concerning Plaintiff after Plaintiff was discharged from Chapter 7 Bankruptcy.

67. Defendants reported Plaintiff's credit history, including names of credit accounts, account numbers, account types, responsibility for the account (i.e., individual or joint accounts), the date the accounts were opened, statuses, and the date of the last status update.

68. In the Public Records section of Plaintiff's consumer reports, Equifax included the bankruptcy case number, court, filing date and the fact that Plaintiff's bankruptcy had been discharged.

69. Experian failed to report Plaintiff's consumer bankruptcy information in the Public Records section and/or in one or more individual tradelines of Plaintiff's consumer reports.

70. Upon information and belief, Defendants received notice of Plaintiff's bankruptcy discharge through their independent collection of Plaintiff's consumer information through vendors such as Lexis-Nexis, as well as from furnishers that provided data regarding the individual tradelines featured on Plaintiff's consumer reports.

71. Defendants are aware that CRAs are generally required to report accounts included in a consumer's Chapter 7 bankruptcy with a status of "discharged through bankruptcy," and with zero-dollar balances, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

72. Experian should have reported Plaintiff's bankruptcy filing and discharge information in the public records section of Plaintiff's consumer reports.

73. Defendants should have reported **all** of Plaintiff's dischargeable, pre-petition debt as included in or discharged in Chapter 7 Bankruptcy, and with a zero-dollar balance.

74. Rather than accurately report the discharged debts, Defendants reported Plaintiff's accounts with numerous inaccuracies.

**Inaccuracies in Plaintiff's Consumer Reports**

75. On or about March 28, 2026, Plaintiff obtained a copy of her credit report from each of the Defendants.

76. Upon review of her credit reports, Plaintiff observed several inaccuracies.

77. As a preliminary matter, Experian did not indicate that Plaintiff had filed for bankruptcy and received a discharge.

78. The name, social security number, and address in Plaintiff's Chapter 7 petition match the information listed on her Experian consumer report.

79. Experian failed to report Plaintiff's bankruptcy discharge even though Equifax had all the correct personal information for Plaintiff in its database which matched the personal information reported in Plaintiff's Chapter 7 petition (e.g., full name, social security number, address).

80. Notably, Equifax and non-party Trans Union accurately reported Plaintiff's public record bankruptcy filing and discharge based on the same information.

81. Additionally, furnishers reported the Plaintiff's discharged/zero account balances, bankruptcy and discharge information to Experian.

82. Experian knew or should have known that Plaintiff's bankruptcy was discharged.

83. Experian reported debts that were in fact discharged in bankruptcy and was therefore required to report these as discharged and with zero-dollar balances. However, Experian's failure to report Plaintiff's bankruptcy in Plaintiff's consumer report contributed to the numerous inaccuracies listed in Plaintiff's consumer report.

84. Upon information and belief, the following furnishers of information accurately reported to Equifax that Plaintiff's accounts were included in Plaintiff's bankruptcy discharge and had a zero-dollar balance after the bankruptcy filing/discharge, but Defendant rejected or revoked the data furnished to it and

inaccurately overrode the reporting of the accounts.

85. Additionally, each of the Defendants was reporting inaccurate information concerning Plaintiff's Nissan account, starting with 2901********* and opened in June 2021 (the "Nissan Account"), which pre-dated Plaintiff's bankruptcy.

86. The Nissan Account was discharged on or about February 10, 2026. Therefore, the Nissan Account should have been reported as discharged in bankruptcy and with a zero-dollar balance.

87. However, Equifax inaccurately reported the Nissan Account with a status of "Charge-Off."

88. Experian inaccurately reported the Nissan Account with a status of "Charge-Off," and with a balance of $33,902.

89. Additionally, Defendants inaccurately reported Plaintiff's Celtic Bank account, starting with 5346************ and opened in October 2023 (the "Celtic Account"), which pre-dated Plaintiff's bankruptcy.

90. The Celtic Account was discharged on or about February 10, 2026. Therefore, the Celtic Account should have been reported as discharged in bankruptcy.

91. However, Defendants each inaccurately reported the Celtic Account with a status of "Charge Off."

92. Additionally, Defendants inaccurately reported Plaintiff's WebBank account, starting with 9253************* and opened in October 2023 (the "WebBank Account"), which pre-dated Plaintiff's bankruptcy.

93. The WebBank Account was discharged on or about February 10, 2026. Therefore, the WebBank Account should have been reported as discharged in bankruptcy.

94. However, Defendants each inaccurately reported the WebBank Account with a status of "Charge Off."

95. Additionally, Defendants inaccurately reported Plaintiff's Oakland County ECU account, starting with 5021************* and opened in June 2022 (the "Oakland Account"), which pre-dated Plaintiff's bankruptcy.

96. The Oakland Account was discharged on or about February 10, 2026. Therefore, the Oakland Account should have been reported as discharged in bankruptcy and with a zero-dollar balance.

97. However, Equifax inaccurately reported the Oakland Account with a status of "Charge Off."

98. Experian inaccurately reported the Oakland Account with a status of "Charge Off," and with a balance of $4,776.

99. Additionally, Experian inaccurately reported Plaintiff's Affirm account, starting with 781V**** and opened in December 2022 (the "Affirm Account"),

which pre-dated Plaintiff's bankruptcy.

100. The Affirm Account was discharged on or about February 10, 2026. Therefore, the Affirm Account should have been reported as discharged in bankruptcy.

101. However, Experian inaccurately reported the Affirm Account with a status of "Charge Off."

102. The status of "Charge Off" in the consumer credit industry means that a debt may still be owed, especially where, as here, the tradelines do not include bankruptcy coding such as included in and/or discharged in bankruptcy, or the tradeline indicates there is a balance and/or past due balance owed on the account before or after the "charge-off."

103. The national consumer reporting agencies specifically acknowledge that a "charge-off" generally means consumers are still legally responsible for paying the debt.

104. According to Defendants, a charge-off means the lender has written the account off as a loss and the account is closed to future charges. The timeframe is generally between 120 and 180 days after a consumer becomes delinquent, and a charge-off does not mean that the consumer no longer owes the debt; the consumer is still legally obligated to pay the debt.

105. Upon information and belief, Lexis-Nexis furnished information to all

three CRAs, including Defendants, that indicated Plaintiff had filed for bankruptcy and received a Chapter 7 discharge, but the Defendants rejected or otherwise failed to report the data they received.

106. Upon information and belief, some or all of the data furnishers of the foregoing tradelines provided information to all three CRAs, including Defendants, that indicated their corresponding accounts had been discharged in bankruptcy, but Defendants rejected or otherwise overrode the data it received.

107. In addition, public records reflecting Plaintiff's bankruptcy filing and subsequent discharge are readily available to the Defendants through multiple sources such as PACER, but Defendants failed to review those sources or knowingly rejected them.

108. In any event, Defendants knew or had reason to know that they reported information contradicted by notices received from third parties.

109. Defendants reported inaccurate account statuses and payment histories.

110. Additionally, Experian reported that Plaintiff owed money that she did not owe.

111. Defendants failed to indicate that Nissan Account, Celtic Account, WebBank Account, and Oakland Account (the "Accounts") were discharged in bankruptcy, and Experian further failed to indicate the Affirm Account was

discharged in bankruptcy.

112. Defendant's reporting of the Accounts and Experian's reporting of the Affirm Account is patently inaccurate.

113. If not patently inaccurate, Defendants' reporting of the Accounts and Experian's reporting of the Affirm Account is materially misleading.

*Plaintiff's Disputes*

114. On or about April 15, 2026, Plaintiff sent certified letters to each of the Defendants disputing their respective inaccurate reporting.

115. In both of the dispute letters Plaintiff: 1) advised that he filed for bankruptcy in August 2025 and received a discharge in February 2026; and 2) included her full Social Security Number, bankruptcy case number, date of birth, home address and phone number.

116. Upon information and belief, Defendants each received Plaintiff's dispute.

117. On or about May 15, 2026, Equifax responded to Plaintiff's dispute.

118. Instead of correcting its inaccurate reporting, however, Equifax requested Plaintiff provide her name, address, SSN and date of birth, despite Plaintiff's dispute letter containing that information.

119. Upon information and belief, Experian did not respond to Plaintiff's dispute.

120. Although Defendants could have verified that the Accounts were discharged through the same sources from which they receive consumer bankruptcy information, they neglected to do so.

121. Rather than perform a reasonable investigation based on Plaintiff's disputes, readily available public records, and information known by Defendants, Defendants either did not investigate Plaintiff's dispute at all, or merely parroted information furnished by DFAS, despite awareness that the information was factually inaccurate and conflicted with information known by the Defendants.

122. On or about June 8, 2026, Plaintiff obtained another copy of her Experian report, and observed that Experian was still not reporting her bankruptcy, and was reporting the Accounts inaccurately.

123. Defendants' respective reporting of the Accounts and Experian's reporting of the Affirm Account is patently false/incorrect and therefore inaccurate.

124. If not patently false, Defendants' respective reporting of the Accounts and Experian's reporting of the Affirm Account is materially misleading, and therefore inaccurate.

*Plaintiff's Damages*

125. Upon information and belief, had Defendants accurately reported the Accounts payments, Plaintiff's credit health and/or scores would have been better.

126. Defendant's reporting of debt that Plaintiff does not actually owe negatively increases DTI since the debt is greater, but the income is unchanged.

127. The false debt also negatively impacts the 30% of credit score which is based on the debt owed divided by credit limits, which impacts post-discharge consumers even more than those who have not filed bankruptcy.

128. After Plaintiff's bankruptcy discharge, in or around July 2026, Plaintiff applied for credit with Capital One, and was approved, but at lower credit limits and worse overall terms than Plaintiff would have otherwise qualified for due to Defendants' inaccurate reporting. Additionally, the offer was conditioned on Plaintiff making a deposit of $200.

129. Defendants' inaccurate reporting, along with additional information belonging to Plaintiff, was published to potential creditors, by Defendants during the process of Plaintiff's credit applications.

130. As a direct result of Defendants' inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm, including, but not limited to, denial of credit.

131. Plaintiff sustained actual monetary damages from the expense of certified mail tracking of Plaintiff's disputes to Defendants, in addition to time and labor by writing and mailing disputes.

132. As a direct result of Defendants' inaccurate reporting, Plaintiff also suffers actual damages in the form of attorneys' fees incurred, related to Defendants' inaccurate reporting.

133. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, loss of sleep, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

134. Defendants' conduct also exacerbated Plaintiff's frustration during the already stressful post-bankruptcy period by hindering Plaintiff's ability to rebuild her credit.

**COUNT I**
**Defendants**
**15 U.S.C. § 1681e(b)**

**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

135. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

136. The FCRA requires consumer reporting agencies, like Defendants, to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

137. In this case, Defendants negligently and willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of Plaintiff's public record and/or credit information after Plaintiff received a Chapter 7 Discharge Order.

138. Defendants knew or should have known that the effect of a Discharge Order in a no-asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding. Defendants know or should have known of their obligations under the FCRA, especially pertaining to reporting discharged debt with zero-dollar balances.

139. These obligations are well established by the plain language of the FCRA, as promulgated by the Federal Trade Commission, detailed in case law, and evidenced in prior cases involving Defendants from which Defendants are on notice of their unreasonable procedures concerning the reporting of discharged debts.

140. Additionally, Defendants possess or can easily obtain substantial written materials that detail CRA's duties and obligations under the FCRA, including those that apply when consumers are discharged from Chapter Bankruptcy.

141. Despite knowledge of these legal obligations, Defendants willfully and consciously breached their known duties and deprived Plaintiff of her rights under the FCRA.

142. Defendants know that discharged debts should not be reported as late, past due, or with outstanding balances after the discharge date, and should be reported with a zero-dollar balance.

143. Defendants independently sought information about Plaintiff's bankruptcy filing and voluntarily reported the same in Plaintiff's consumer reports.

144. Defendants received notice of Plaintiff's bankruptcy and discharge through public records, independent collection of consumer information directly obtained by Defendants through sources of consumer information such as Lexis-Nexis, Defendants' own files, and information provided by data furnishers, yet Defendants rejected the information.

145. Specifically, Experian knew or should have known about Plaintiff's bankruptcy filing and discharge and failed to include that information in Plaintiff's consumer disclosure and in consumer reports published to third parties.

146. Furthermore, when Equifax procured and published Plaintiff's bankruptcy information, it had an obligation to ensure it followed reasonable procedures to report the bankruptcy discharge and its effects with maximal accuracy.

147. Defendants' unreasonable policies and procedures cause them to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, who have been discharged from Chapter 7 Bankruptcy.

148. Defendants inaccurately reported the Accounts, which should have each been reported as discharged in bankruptcy *and* with a zero-dollar balance.

149. Defendants' violations of 15 U.S.C. § 1681e(b) were willful.

150. Alternatively, Defendants violations of 15 U.S.C. § 1681e(b) were negligent.

151. Defendants' inaccurate reporting damages Plaintiff's creditworthiness.

152. Plaintiff suffers actual damages, including the above-referenced economic damages, a decreased credit score, loss of credit opportunities and other financial harm caused by Defendants' inaccurate reporting.

153. Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, loss of sleep, shock, embarrassment, and anxiety.

154. Defendants are each a direct and proximate cause of Plaintiff's damages.

155. Defendants are each a substantial factor in Plaintiff's damages.

156. Therefore, Defendants are individually liable for actual and statutory damages, punitive damages, and attorneys' fees and costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq*.

**COUNT II**
**Defendants**
**15 U.S.C. § 1681i**

**Failure to Perform a Reasonable Reinvestigation**

157. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

158. When a consumer disputes the accuracy or completeness of information included in a CRA's credit file, the FCRA requires the agency to either conduct a reasonable reinvestigation into the disputed information **or** delete the disputed information from the consumer's credit file within thirty (30) days of receiving notice of the dispute. 15 U.S.C. § 1681i(a)(2)(A).

159. When conducting its reinvestigation of disputed information in a consumer report, the consumer reporting agency is required to "review and consider all relevant information submitted by the consumer."

160. Additionally, the CRA must notify the person who furnished the disputed information of the consumer's dispute within five business days of its receipt. When notifying the furnisher of the consumer's dispute, the CRA is to "include all relevant information regarding the dispute that the agency received from the consumer." 15 U.S.C. § 1681i(a)(2)(A).

161. Thus, in addition to violating the FCRA by failing to follow reasonable procedures as 15 U.S.C. § 1681e(b) requires, Defendants also violated the FCRA by

failing to perform a reasonable reinvestigation even after Plaintiff notified them of the inaccurate information in Plaintiff's credit file.

162. Defendants' violations of 15 U.S.C. § 1681i include, but are not limited to the following:

a. Failing to reasonably reinvestigate the inaccurate information Plaintiff disputed.

b. Failing to consider all relevant information while investigating Plaintiff's dispute.

c. Failing to include all relevant information when notifying the relevant furnisher(s) of Plaintiff's dispute.

d. Instead of reasonably reinvestigating Plaintiff's dispute, Defendants continued to report Plaintiff's accounts and/or public record information inaccurately after Plaintiff's bankruptcy discharge.

163. Defendants' inaccurate reporting damaged Plaintiff's creditworthiness.

164. Plaintiff suffers actual damages, including a decreased credit score, loss of credit opportunities, credit denial, and other financial harm caused by Defendants inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the debt was discharged in bankruptcy.

165. Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

166. Defendants are each a direct and proximate cause of Plaintiff's damages.

167. Defendants are each a substantial factor in Plaintiff's damages.

168. Defendants' acts, as described above, were done willfully and knowingly; or, alternatively were committed negligently.

169. Therefore, Defendants are individually liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq*.

## V. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgments against Defendants for the following:

(a) Declaratory judgment that Defendants violated the FCRA, 15 U.S.C. § 1681e(b) and § 1681i;

(b) An award of actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1) or 1681o(a)(1);

(c) An award of statutory damages pursuant to 15 U.S.C. §§ 1681n(a)(1) and 1681o(a)(1);

(d) An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. § 1681n(a)(2),

(e) Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

(f) Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## VI. JURY DEMAND

Plaintiff hereby demands jury trial on all issues so triable.

RESPECTFULLY SUBMITTED on July 10, 2026.

By: */s/ Landon T. Maxwell*
Landon T. Maxwell, AZ #038439
**CONSUMER JUSTICE LAW FIRM PLC**
8095 N 85th Way
Scottsdale, AZ 85258
T: (480) 626-1975
F: (480) 613-7733
E:lmaxwell@consumerjustice.com

*Attorney for Plaintiff*
*Linda Holt*